**LAUGHLIN, Plaintiff-Appellant, v. CLEVELAND (City) (Cleveland Transit System), Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24317. Decided February 27, 1958.

John R. Crossen, J. W. Wursthorn, for plaintiff-appellant.
Robert F. Mooney, Robert Fletcher, for defendant-appellee.

## OPINION

By KOVACHY, J:

This appeal comes to this court on questions of law from a judgment entered in the Common Pleas Court of Cuyahoga County wherein the trial court directed the jury to bring a verdict in favor of the defendant at the close of plaintiff's evidence.

Plaintiff, appellant herein, assigns as errors (1) the court's refusal to submit the case to the jury and (2) the court's refusal to allow a poll of the jury.

At the very outset, we overrule assignment No. 2 which is palpably

without merit. A directed verdict in favor of a party is the decision of the court. The jury in such case is merely the instrumentality for carrying out the order of the trial judge and acts purely in a ministerial capacity. The polling of the jury under those circumstances not only has no sanction in law but could be of no help whatever to the trial court or an appellate court in determining the question of whether or not reasonable minds can differ as to the evidence presented when construed most favorably in behalf of the party against whom the motion for a directed verdict is presented.

The case here involves a collision between an automobile driven by plaintiff and a bus operated by the Cleveland Transit System at the intersection of Milford Road, Meadowbrook Boulevard and Warrensville Center Road in University Heights.

Milford Road runs northwest and southeast, Meadowbrook Boulevard northeast and southwest, and Warrensville Center Road north and south. Meadowbrook Boulevard and Milford Road join Warrensville Center Road from the east. Meadowbrook Boulevard alone continues westerly from Warrensville Center Road. Plaintiff's Exhibits 1 and 4 show a stop sign for southwest traffic on Meadowbrook Boulevard before entering the intersection but none for Milford Road although the plaintiff testified there was a stop sign there.

This five-point intersection is controlled by three sets of automatic traffic lights positioned as shown in Joint Exhibit No. 1. The northernmost set controls traffic flowing northbound on Warrensville Center Road. The southernmost set controls traffic flowing southbound on Warrensville Center Road. The set in between these two controls the flow of traffic on Milford Road and Meadowbrook Boulevard.

Plaintiff testified that he was driving northwest on Milford Road about 7:15 A. M. on March 25, 1954, in daylight; that as he approached this intersection, the traffic light that controls traffic on Meadowbrook Boulevard and Milford Road was "Green" or "go"; that he was going ten to fifteen miles per hour; that he looked to his right to see if there was any traffic on Meadowbrook Boulevard and that he saw nothing; that there were no leaves as yet on the trees and he could see up Meadowbrook Boulevard for one hundred feet; that he looked to the left and "saw no traffic coming from Warrensville north his way from Meadowbrook" and "proceeded to take advantage of the green light and came across, almost made my complete crossing of this junction here when I was struck." He testified further that he proceeded in a straight course from Milford Road across the intersection comprising the open space within the prolongation of the curb lines of Meadowbrook Boulevard and Milford Road and was about to start turning to the right to go north on Warrensville Center Road when a bus operated by the defendant southwest on Meadowbrook Boulevard struck the midsection of the right of his automobile with its left front corner.

Plaintiff in his amended petition alleges that the defendant in the operation of its bus was negligent in the following respects:

1. In that it failed to abate the speed of its vehicle when its agent saw or should have seen plaintiff's automobile in its path;

2. In that through its agent it failed to keep a proper lookout for other traffic, particularly the vehicle driven by plaintiff;

3. In that it failed to sound a warning to plaintiff when it saw or should have seen him in its path; and

4. In that it failed to divert the course of its vehicle when it saw the automobile driven by plaintiff in its path.

\*   \*   \*   \*   \*

Plaintiff in his brief and in argument contends that the evidence, when construed most strongly in favor of the plaintiff, showed that the plaintiff exercised due diligence while entering the intersection of the streets he and the bus were traveling, and that since the plaintiff saw no bus coming when he first looked to the right and could see some one hundred feet up Meadowbrook Boulevard and the accident occurred thereafter after the lapse of several seconds, it is reasonable to infer that the driver of the bus was proceeding at a speed at which he was unable to maintain proper control of his vehicle and that he did not exercise diligence in observing oncoming traffic, in wanton disregard of the rights of others.

The defendant maintains that since Meadowbrook Boulevard and Milford Road were controlled by the "same face of the same traffic light" there was no traffic control as between those two streets and that consequently the vehicle to the right had the right of way under §4511.41 R. C. The defendant further maintains that one cannot infer that the bus was operated at an unlawful rate of speed from the lone fact that plaintiff did not see any vehicle for one hundred feet when he looked up Meadowbrook Boulevard, so as to deprive itself of its preferential right of way, citing as authority **Lamden v. City of Cleveland, 165 Oh St 177, 134 N. E. (2d) 380.** The trial court adopted defendant's view of the law in its ruling on the motion.

\*   \*   \*   \*   \*

There can be no question in this case that the traffic control signal regulated traffic on both Meadowbrook Boulevard and Milford Road. It was hung, as shown in Plaintiff's Exhibit No. 4, with the face on the east side pointing more toward Milford Road than Meadowbrook Boulevard but clearly intending to control traffic on both streets. Moreover, the streets are of equal width and extend through residential districts. They converge from a generally easterly direction and intersect each other and Warrensville Center Road to form a five-point intersection

Sec. 4511.13 R. C., in parts pertinent hereto reads:

"Whenever traffic is controlled by traffic control signals exhibiting the words 'go,' 'caution,' or 'stop,' or exhibiting different colored lights successively one at a time . . . the following colors only shall be used and the terms and light shall indicate and apply to operators of vehicles, streetcars and trackless trolleys, and pedestrians as follows:

"(A) Green alone or 'go' signal:

"(1) . . . . .

"(2) All other traffic facing the signal except as provided under §§4511.36 and 4511.58 R. C., may proceed straight through or turn right or left, unless a sign at such place prohibits either such turn. But such

traffic shall yield the right of way to vehicles, streetcars, and trackless trolleys lawfully within the intersection and to pedestrians lawfully within a crosswalk at the time such signal is exhibited."

"Intersection" is defined in §4511.01 (II) R. C.:

" 'Intersection' means the area embraced within the prolongation of the lateral boundary lines of two or more highways which join one another."

It is our view, on the basis of the conditions existing at this intersection and the law applicable thereto, that vehicles proceeding westerly on Meadowbrook Boulevard and Milford Road had equal rights to enter and proceed across said intersection on the "green" or "go" light subject only to the qualification that each exercise ordinary care commensurate with the existing danger of collision.

In **Welch v. Canton City Lines, Inc.,** 142 Oh St 166, 50 N. E. (2d) 343, wherein an accident took place between two busses at an intersection, one crossing the intersection east on the "green" light and the other north with the light on its side not in operation, the Supreme Court held in **paragraph 2** and **3** of the syllabus, as follows:

"2. A motor vehicle has the right to enter any street intersection upon a signal by a police officer or a green or go light in a traffic signal located in such intersection, but such driver is not absolved from exercising ordinary care in operating such vehicle.

"3. Where a motor vehicle traveling north in a lawful manner on a main thoroughfare enters a street intersection prior to another motor vehicle which is traveling east on an intersecting street and enters such intersection upon a green or go light, both vehicles are lawfully in such intersection; the drivers of such vehicles have equal rights and each is required to exercise ordinary care to avoid a collision." (See **Ohio Oil Co. v. Liles,** 54 Oh Ap 124, 6 N. E. [2d] 18.)

We hold, therefore, that the traffic light here in question controlled the movement of traffic on both Meadowbrook Boulevard and Milford Road; that plaintiff's automobile and defendant's bus were lawfully within the intersection of these streets, having entered on the "green" or "go" light; that the drivers of these vehicles had equal rights to proceed across said intersection subject to the duty of each to exercise ordinary care commensurate with the conditions and circumstances existing to avoid a collision; that the statute granting the vehicle approaching from the right the right of way had no application.

The court in considering a motion for a directed verdict at the close of plaintiff's evidence must construe the evidence, **together with all reasonable inferences,** most strongly in favor of the plaintiff. In view of plaintiff's testimony that the bus struck the side of plaintiff's automobile when he had almost traversed the intersection, and in view, further, of plaintiff's evidence that as he entered the intersection the bus was not in sight within approximately a distance of one hundred feet on Meadowbrook Boulevard, a reasonable inference might be drawn that the driver of the bus was negligent in so running into him by failing to abate his speed, keep a proper lookout, sound a warning or divert his course when he saw or should have seen plaintiff's automobile.

At least it presented an issue upon which reasonable minds could reach different conclusions and was for a jury to decide. By reason whereof, the motion for a directed verdict should have been overruled and the defendant required to go forward with his evidence.

Leonard v. Kreider, 128 Oh St 267, 190 N. E. 634:

"2. It is prejudicial error for a trial court to direct a verdict in favor of the defendant at the conclusion of the plaintiff's evidence when reasonable minds might conclude that such evidence establishes all the essential elements of the plaintiff's case."

Accordingly, the judgment is reversed and the cause remanded for further proceedings according to law. Exceptions. Order see journal.

HURD, J, concurs.
SKEEL, PJ, dissents.

## DISSENTING OPINION

By SKEEL, PJ.

The plaintiff's action is one seeking damages resulting from the alleged negligence of the defendant in the operation of one of its buses on the morning of March 25, 1954, at the intersection of Meadowbrook Boulevard, Milford Road and Warrensville Center Road, in the City of University Heights.

Warrensville Center Road, which is a through highway, as defined by §4511.01 (F. F.) and §4511.07 (F) R. C., is ninety three feet wide, the roadway of which is sixty five feet in width, which road runs in a northerly and southerly direction. Meadowbrook Boulevard intersects Warrensville Center Road at an angle of about 55° running to the northeast, and at the same angle to the southwest. Meadowbrook Boulevard is also a through highway (See §4511.01 [F. F.] and §4511.07 [F] R. C.), upon which the defendant operates one of its bus lines as a part of its public passenger transportation system. Milford Road runs southeast, beginning at the intersection at Warrensville Center Road with Meadowbrook Boulevard, so that the total expanse of roadway in the intersection on the east side of Warrensville Center Road is one hundred seventy six feet at the curb line, ninety feet at the closest point where the northerly side of Meadowbrook Boulevard comes to the southerly side of Milford intersection and extending from the easterly side of Warrensville Center Road to the most westerly point of the circular curb line between the two converging streets, a distance of sixty six feet. There is a traffic stop sign on the north or northeast side of Milford Road just before it reaches its intersection with the west side of Meadowbrook Boulevard.

Sec. 4511.01 (F. F.) R. C., provides:

" 'Through highway' means every highway or portion thereof at the entrance to which vehicular traffic from intersecting highways is required by law to stop before entering or crossing the same."

Sec. 4511.07 (F) R. C.. provides:

"Designating any highway as a through highway and requiring that all vehicles, trackless trolleys, and streetcars stop before entering or crossing the same, or designating any intersection as a stop intersec-

tion and requiring all vehicles, trackless trolleys, and streetcars to stop at one or more entrances to such intersection;"

There are three traffic lights at this intersection. One is in the center of the northbound half of the roadway of Warrensville Center Road opposite the northerly part of Meadowbrook Boulevard, running to the east from Warrensville Center Road. One is in the middle of the southbound roadway of Warrensville Center Road opposite the southerly part of Meadowbrook Boulevard, running to the west from Warrensville Center Road. These two lights control the movement of north and south bound traffic. The third light is in the center of Warrensville Center Road at a point where the center line of Meadowbrook Boulevard crosses Warrensville Center Road, its position being in no observable relation to either the continuation of the center line or curb lines or otherwise of Milford Road and from photographs introduced by the plaintiff, the direction of the light which controls traffic crossing Warrensville Center Road at this intersection is at about the angle and pointing directly toward Meadowbrook Boulevard to the west and in approximately the same general direction toward Meadowbrook Boulevard to the east.

The plaintiff, a doctor, at 7:15 A. M. (it then being broad daylight), was driving northwest on Milford intending to pass through the easterly side of the intersection just described to go north on Warrensville Center Road on his way to Huron Road Hospital in East Cleveland. In doing so, he met with the accident that is the subject of this action. In describing what took place, he testified:

"Q. As you came down Milford on the day of the accident, was there a stop sign there?

"A. Yes, sir.

"Q. Did you stop?

"A. No, sir.

"Q. Why did you not stop?

"A. I didn't stop because I had the green light.

"Q. You had the green light where?

"A. The green light for this particular street, for Milford.

"Q. Would that be the green light that I am indicating on Plaintiff's Exhibit I here?

"A. Yes, sir. It is the green light that regulates Meadowbrook and Milford."

There is no evidence in the record other than the opinion of the plaintiff, as just quoted (which is a pure conclusion on his part), that the traffic light to which he referred as controlling traffic over or into Warrensville Center Road at this intersection, was intended to apply equally to and give the same right to proceed into Warrensville Center Road from Milford Road without concern (except for the duty to exercise ordinary care) as to traffic likewise moving in a westerly direction from Meadowbrook Boulevard (a through road), into or across Warrensville Center Road. These two streets intersect at a point sixty six feet east of Warrensville Center Road and a vehicle moving into the intersection from Milford Road to go north on Warrensville Center Road

passes at an angle over all of Meadowbrook Road to accomplish such purpose.

The plaintiff testified further as follows:

"As you approached Meadowbrook, you were coming slightly downgrade, were you not.

"A. That's right.

"Q. As you approached Meadowbrook, approximately how fast were you driving?

"A. 10 or 15 miles an hour, I would judge.

"Q. Did you at any time see the traffic light, as indicated on Plaintiff's Exhibit 1, to the right here?

"A. Yes, sir.

"Q. What color was that traffic light?

"A. It was green.

"Q. Did you look to your right at any time—can you see it, Judge?

"THE COURT: Are we talking about the traffic light in the center, now? I don't want to obscure the view of any juror.

"Q. It was green. And you have said you were driving at 10 or 15 miles an hour, I believe.

"Did you look to your right at any time before entering the intersection?

"A. Yes. I first looked to my right to see if there was any traffic on Meadowbrook, and I saw nothing.

"Q. Doctor, what time of the year did this accident occur?

"A. In March.

"Q. Were there any leaves on the trees at that time?

"A. No. The trees were pretty much as you see now in this picture.

"Q. How far up Meadowbrook could you see when you looked to your right?

"A. Approximately 100 feet, I would say.

"Q. Did you see any traffic coming?

"A. I didn't see any traffic coming.

"Q. Was there any traffic coming?

"A. I don't know. I did not see any traffic. I didn't know there was any traffic coming until the accident occurred later.

"Q. That isn't what I asked you.

"A. I looked—

"Q. Now—

"A. I looked to my right, I saw nothing.

"Q. And how far could you see?

"A. I could see up here at least a hundred feet.

"Q. At least a hundred feet?

"A. I then looked to my—

"Q. Please wait for the question, doctor. What is your vision?

"A. 20/30 and 20/40.

"Q. You wear glasses, I notice?

"A. Yes, sir. I have astigmatism.

"Q. Were you wearing glasses at that time?

"A. Yes, sir.

"Q. Was it daylight or dark?

"A. 7:15 in the morning; it was daylight.

"Q. Did you have the lights on in your car?

"A. No, sir.

"Q. It was daylight enough that you did not need the lights?

"A. That's right.

"Q. So you looked to your right and you could see a hundred feet or so up there and there was no traffic coming. Then what did you do?

"A. Then I looked to the left to see how clear I was on the Warrensville side, and I saw no traffic coming from Warrensville north this way from Meadowbrook. And so I proceeded to take advantage of the green light and came across, almost made my complete crossing of this junction here when I was struck.

"THE COURT: I understand the witness to say he saw no traffic going north on Warrensville Center?

"THE WITNESS: I saw no traffic anywhere.

"Q. When you turned your head to the left, did you glance back up Warrensville?

"A. Yes, sir. I looked south on Warrensville and southwest on Meadowbrook, and then was in the process of turning my head when the accident occurred.

"Q. Will you resume the stand, please?

(Witness resumes the witness stand.)

"Q. Now, you say an accident occurred. Do you mean by that your automobile was involved in an accident with a bus, is that right?

"A. Yes, sir.

"Q. What part of your automobile was struck?

"A. The mid-section of the right side of the car.

"Q. The mid-section of the right side. Do you know, of your own knowledge, what part of the bus struck you?

"A. Yes. The left front corner of the bus struck me in the side.

"Q. How do you know that?

"A. I saw it after I got out of the car."

The plaintiff then testified that the bus driver tried to get him to sign a release and that he had to listen to a lecture while he was getting out of his car. He then went to the home of a neighbor and called the police. Upon arrival at the scene, the police asked him how he was. He then told them:

"That I would like to go to Huron Road Hospital. And they said— I said, 'Just take care of the car as you see fit.' So that they took me to Huron Road Hospital, and that was that."

When the plaintiff reached the hospital, he proceeded with a scheduled operation which he described as "the removal of a stone from a kidney."

On cross-examination, the plaintiff again gave his version of the collision as follows:

"Q. As I understand what you said, as you were approaching this intersection you first looked to the right, then you entered the intersection and looked to the left down Warrensville, I think you said south on Warrensville?

"A. No, I didn't say any of that.

"Q. Well, doctor, supposing you tell us what you did, then?

"A. All right.

"Q. Then I will understand.

"A. I approached the intersection and noticed I had the green light. That was the first thing. Then I looked to the right and saw no traffic coming, which was up Meadowbrook.

"Q. Where were you when you looked to the right, if you don't mind my interrupting?

"A. I do mind.

"Q. I am sorry, doctor, but this is a courtroom and you are not the doctor.

"A. That's perfectly all right. I just want to know which question to answer first.

"Q. Where were you when you looked to the right, doctor? That's all.

"A. I was approaching the intersection.

"Q. All right. Then what happened?

"A. Then I looked to the right, first looked at the green light that was on. I looked to the right to see if there was any traffic coming from Meadowbrook. I saw no traffic. I then looked to the left to see if there was any traffic coming northerly on Warrensville or northeasterly on Meadowbrook, and I saw no traffic. So I proceeded to go right across my intersection. And as I turned my head, apparently that is when—

"Q. You never again looked to the right, did you? You were struck as you were looking back from your look to the left, is that correct?

"A. As I turned my head to the right, I was struck.

"* * *

"Q. When you turned your head back to the right, doctor, how far did you turn it? Maybe that will make it a little clearer.

"A. I wouldn't be able to answer that, I'm sorry. I don't know.

"Q. Did you ever see the bus before the accident happened?

"A. No, I never saw the bus before the accident happened."

It is the unquestioned and uncontradicted story of the plaintiff that he did not stop at the stop sign when he drove out of Milford into the intersection, that he looked to his right and did not observe any traffic moving west on Meadowbrook Boulevard. He then proceeded into the intersection at from 10 to 15 miles per hour until he got to a point a few feet from the east curb line of Warrensville Center Road, and north by a few feet of the center line of the combined intersection of Meadowbrook Boulevard with Milford Road when the right side of his automobile was struck by the front left corner of defendant's bus, where (the evidence seems to indicate) both vehicles came to a complete stop. The distance plaintiff traveled, as measured on one of plaintiff's exhibits, from the stop sign on Milford Road to the place which plaintiff marked as the place where the vehicles collided, was somewhat more than eighty feet, which at 10 miles per hour, would take five seconds to traverse, or at 15 miles per hour, 3½ seconds to traverse. The plaintiff testified that while driving this distance, he never saw the bus until the collision took

place although the intersection was clear and without obstruction. The approach of the bus was clearly to the right of plaintiff's automobile.

**Sec. 4511.41 R. C.**, provides:

"The operator of a vehicle, streetcar, or trackless trolley, shall yield the right of way at an intersection to a vehicle, streetcar, or trackless trolley approaching from the right."

**Sec. 4511.43 R. C.**, provides:

"The operator of a vehicle, intending to enter a through highway, shall yield the right of way to all other vehicles, street cars, or trackless trolleys on said through highway.

"The operator of a vehicle, streetcar, or trackless trolley shall stop in obedience to a stop sign at an intersection and shall yield the right of way to all other vehicles, streetcars, or trackless trolleys not obliged to stop.

"The operator of a vehicle, streetcar, or trackless trolley in obedience to a yield sign shall yield the right of way to all other vehicles, street-cars, trackless trolleys, or pedestrians approaching from a different direction into its or his path."

As indicated, Meadowbrook Boulevard is a through highway. The plaintiff drove into the intersection without stopping and continued into the path of the bus without affording it the right of way, that is, he continued on into the intersection, arriving at the point of the collision just in time to be struck by defendant's bus.

It is, of course, necessary for the court to give the most favorable light to the evidence of the plaintiff in passing on the motion for judgment at the conclusion of the plaintiff's case but in doing so, the court, in this case, has also the right to consider, as is clearly shown by the record, the unrestrained arrogance of the plaintiff toward the judicial process of which he is seeking to invoke its benefits.

The evidence so considered was such that the trial court was completely justified in finding that reasonable minds could come to but one conclusion as to the failure of the plaintiff to make out a prima facie case against the defendant. There is not a syllable of evidence as to the conduct of the bus driver or that any negligent act of his was a proximate cause of the collision. In fact, no act of this bus driver is shown prior to the actual collision.

The Supreme Court in the case of **Pitt v. Nichols, 138 Oh St 555,** 37 N. E. (2d) 379, in syllabus one, said:

"1. A presumption of negligence does not arise from the mere fact that a collision occurred which resulted in injury. Some evidence must be adduced tending to show failure in the performance of some duty by the party charged therewith, and it must be evidence from which a rational conclusion of negligence can be drawn."

Likewise, in the case of **Parras v. The Standard Oil Co., 160 Oh St 315,** 116 N. E. (2d) 300, in syllabus one, the Supreme Court said:

"1. The mere happening of an accident gives rise to no presumption of negligence, and where one is accidentally injured while he is a business guest upon the premises of another, the burden is upon the person injured to show negligence upon the part of such other before he can recover damages from such other."

In considering the question of negligence of a driver of a motor vehicle having the right of way at an intersection, he must be judged as to his conduct with the benefit of such right. **Indianapolis & Southeastern Trailways, Inc. v. Cincinnati Street Ry. Co., 166 Oh St 310,** 142 N. E. (2d) 515. Other drivers coming within the intersection must, in the exercise of ordinary care, respect such preferential right of way. Without any evidence of misconduct of the bus driver, or as is the fact here, no evidence of any kind dealing with the manner in which the bus driver drove into the intersection, except the actual collision, the plaintiff has completely failed to make out a prima facie case.

The evidence that the plaintiff did not see a bus when he looked to the right is negative in character and of no value here when from the physical facts, as alleged by the plaintiff, the bus was at the scene, and the attempt to show negligence on the part of the bus driver, without some direct evidence describing his conduct, a prima facie case is not established, the duty to look for approaching traffic and to see what, in the exercise of due care, was there to be seen, was clearly the obligation of the plaintiff. In the case of **MacDiarmid Candy Co. v. Schwartz, 11 Oh Ap 303,** at page 305, in discussing the duty of a plaintiff not only to look but also to see what is there to see, the court said:

"Whether we accept the version of the occurrences there as claimed by the plaintiff, that he walked across the cross-walk in front of an approaching machine after looking and failing to see the machine, and after the street car had moved southward (the only effect of which could be to enlarge his field of vision), or accept the version established by the other witnesses, that plaintiff rounded the rear of the southbound street car while it was at a standstill, and crossed the street at a point not on the cross-walk, in the path of an approaching lighted automobile, at the intersection lighted by an arc light, we are unable to distinguish this case under either version from the following authorities: **Schmidt v. Schalm, 2 Oh Ap 268;** Green v. Northern Ohio Traction & Light Co., 16 C. C., N. S., 474, and Shott v. Korn, 17 C. C., N. S., 393. It is apparent to us that under either version the plaintiff did not look in crossing said street, and thereby failed to use his senses for his own safety; or, if he did look and failed to see the automobile, under the circumstances the situation is the same; or if he did look and saw the machine, he dashed across the street in front of the approaching machine. In either event, under the above authorities, he was guilty of contributory negligence as a matter of law under the circumstances of this case, which prevents a recovery."

The syllabus in the MacDiarmid Candy Company case, above referred to, provides:

"One who alights from a street car, passes behind the same, and thence into the pathway of an approaching automobile, is, as a matter of law, guilty of contributory negligence, which prevents a recovery of damages, by failing to look before crossing the street, or by looking and failing to see the automobile, or by proceeding across the street in front of such approaching machine after seeing the same."

See also, **The Martin Baking Co. v. Tompkinson, 27 Oh Ap 355,** syllabus 3, 161 N. E. 288.

In the case of **Kazdan v. Stein, 118 Oh St 217,** 160 N. E. 704, the syllabus provides:

"Evidence which generally and categorically denies the existence of a fact may be so discredited or may so discredit itself as to destroy its probative value; but no degree of discredit which does not of itself amount to affirmative proof of such fact, will afford a foundation upon which to base an inference that the fact exists."

For the foregoing reasons, the judgment of the trial court should be affirmed.